Filed 12/23/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KEITH GODDARD et al., | F069343 |
| Plaintiffs and Appellants, | (Super. Ct. No. 659261) |
| v. | |
| DEPARTMENT OF FISH AND WILDLIFE, | **OPINION** |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Stanislaus County. Hurl W. Johnson III, Judge.

Law Offices of Carcione, Cattermole, Dolinski, Stucky, Markowitz & Carcione, Joseph W. Carcione, Jr., Joshua S. Markowitz and Joshua J. Henderson for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Kathleen Kenealy, Chief Assistant Attorney General, Kristin G. Hogue, Assistant Attorney General, and Peter A. Meshot, Deputy Attorney General, for Defendant and Respondent.

Leonard Goddard (Goddard) drowned in the Tuolumne River downstream from the remnant of what was once known as the Dennett Dam. His adult children, Keith Goddard and Kristy Monroe (plaintiffs), sued the State of California (State) and several other public entities claiming they were liable for Goddard's death under Government

Code section 835[1] because his death was caused by a dangerous condition of public property.

Two State departments, the Department of Fish and Wildlife (DFW) and the Department of Water Resources (DWR), answered the complaint on the State's behalf and subsequently filed motions for summary judgment, asserting they could not be liable under section 835 because they did not own or control the dam remnant. They also argued they were immune from liability under section 831.2 because Goddard's death was caused by a natural condition. The trial court denied DWR's motion, but granted summary judgment to DFW. Plaintiffs appeal from the resulting judgment in DFW's favor. We conclude both that DFW was immune from suit under section 831.2 and that it did not own or control the dam remnant, and therefore affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

On October 22, 2009, 56-year-old Goddard drowned in the Tuolumne River allegedly after getting caught in the current over a breach in the remnant of Dennett Dam. On that day, Erasmo Ramirez, who was working in a friend's junkyard on the south side of the Tuolumne River near the 9th Street Bridge and dam remnant, heard someone yelling for help, ran to the junkyard fence, and saw Goddard hanging off some metal in the dam remnant in the middle of the river. Ramirez did not know how Goddard got there. On a photograph of the dam remnant, which depicts lines of wooden poles standing upright on the left and right sides of the river and a small "waterfall" in the middle, Ramirez identified the spot in the middle of the "waterfall" where he saw Goddard.

*The History of the Dam*

The City of Modesto (the City) originally constructed Dennett Dam (the dam) in 1933 and never transferred its ownership interest to another party or entity. In its

---

[1] Undesignated statutory references are to the Government Code.

2.

application to DWR to construct the dam, the City listed itself as the owner and stated the dam was a timber, collapsible weir, the purpose of which was to increase river depth for boating, swimming and river sports. The City contracted with a company to construct the dam, and paid for its construction. The DWR issued to the City a certificate of approval for the dam in July 1934.

From 1934 to 1962, the City maintained, repaired, and made alterations to the dam, while the DWR issued the City certifications of approval for alterations to the dam and periodically inspected it. In 1936, the City applied to DWR to repair or alter the dam to drive a 65 foot width of steel sheet piling 20 feet into the riverbed, which eventually would go completely across the river. The project was completed and the DWR issued its certificate of approval in December 1937. In August 1947, during a DWR inspection, a DWR inspector met with the City's assistant city engineer at the dam; they observed wood rot and deterioration of the dam that the DWR documented in September 1946. The City engineer had already communicated to DWR that the dam was in unsatisfactory condition. From August to November 1947, there was correspondence between the DWR and the City in which the DWR advised the City the dam was in unsatisfactory condition, and plans for repair would have to be prepared and submitted for approval. The City, however, advised the DWR it had no funds in its annual budget through June 1948 to make repairs.[2]

From 1948 to 1956, DWR periodically inspected and photographed the dam. DWR and the City communicated about repairs, the City's lack of budgeted funds to plan and effect repairs, the continued deterioration of the dam structure, and ongoing cessation of water impoundment. In December 1953, DWR found on inspection that the dam was

---

[2] A City memorandum dated November 5, 1986, that gives a short history of the dam, states: "The name was changed to Dennett Dam approximately in 1948. By this time the replacement dam had been damaged so severely, it was condemned by the [S]tate."

still out of service due to the need for extensive repairs or reconstruction; while DWR was considering ruling that the structure was no longer within its jurisdiction, DWR agreed to defer this decision to allow the City an opportunity to investigate the feasibility of reconstruction.

In February 1956, Stanislaus County submitted an application to approve plans to repair or alter the dam, which listed the City as the dam owner and stated that the repair would be a joint project of the County and City. The work contemplated, which would be put out to bid, included moving a fish ladder designed under DFW requirements from the north side of the river to the south side. In May 1959, Stanislaus County provided DWR with the bids to rebuild the dam and advised that the project was "momentarily stopped" because the City had rejected all of them. In 1960 and 1962, DWR inspected the dam to verify it remained out of service.

In October 1962, DWR advised the City: The dam had been carried on its roster of dams within the State's jurisdiction for supervision as to safety pursuant to Division 3 of the Water Code; since 1947, the "structure" had been out of service due to disrepair, and as of 1962, was incapable of storing water safely; the dam was never reconstructed despite several attempts by the City and Stanislaus County to do so; the "structure" no longer qualified as a dam as defined by Division 3 of the Water Code because it was incapable of storing 50 acre-feet or more of water and was less than six feet high; and therefore, the DWR was removing the dam from the roster of dams within its jurisdiction and proposed to take no further action in connection with the dam.[3]

_____

[3] DWR, through the Division of Safety of Dams (DSOD), oversees and regulates dam safety against catastrophic failure through communications with dam owners or their designated representatives, but only for dams within the jurisdictional size limitations described in the Water Code. If a dam is not within the DSOD's jurisdiction, the DSOD has no authority to oversee its safety or request information for removal; when a dam is taken out of jurisdiction, the DSOD sends the owner a letter to that effect.

Once the dam was taken out of DWR's jurisdiction, the City did not need to seek the DSOD's permission to breach the dam remnant; DSOD had no statutory authority to request anything on the dam or require permission from anyone to do anything to it. DWR's file on the dam ended in 1962, was marked for archives, and there was nothing to indicate the dam was ever repaired back to jurisdiction.

In 1995, an Advisory Council and Action Team established by Assembly Bill 3603 issued the San Joaquin River Management Plan (management plan), which was prepared for the State's Resources Agency. The management plan was prepared as a consensus effort by a wide range of federal, State and local agencies and private interests, and included the part of the Tuolumne River through the City where the dam remnant is located. The management plan included a recommended study of the removal of the dam remnant as a possible impediment to adult salmon migration and increased vulnerability to poaching and predation of juvenile salmon. The management plan noted: The footing of the dam still remained on the Tuolumne River; the DFW had made a mid-channel breach to facilitate fish passage at low flow; a fish ladder was installed at one time, but had washed away; and DFW had done "some preliminary scoping" of removal of the remaining structure.

In June 2005, Bulletin 250, entitled "Fish Passage Improvement[,]" was issued as an element of CALFED's Ecosystem Restoration Program, a joint effort of federal and State agencies. The bulletin addressed the problem of fewer salmon and steelhead in the Central Valley, including the Tuolumne River, and the location of the dam remnant. The bulletin related the dam's history. It stated that the City built the dam, a low, concrete structure, in 1933 for recreation; it created a swimming and fishing lake on the river. At one time, there were fish ladders at each end of the dam, and in the 1940's, there was a counting station for salmon. The dam fell into disuse and the concrete was eroding. Later, the top portion of the dam was removed, but the footing remained, potentially creating a passage barrier to juvenile and migrating fish, as well as a hazard to

5.

recreational boaters. In the 1970's, DFW made a mid-channel breach to allow fish passage at low flows and installed a fish ladder that later washed away; DFW had investigated removing the structure.[4]

The bulletin further explained that the City had targeted the dam for removal as part of a master plan for development of the Gateway portion of the Tuolumne River Regional Park (TRRP) system. In 2002, DWR saw an opportunity to remove the dam sooner in conjunction with the replacement of the 9th Street Bridge, which sits directly over the dam, and approached the City with this proposal. There was not enough time left in the planning schedule, however, to alter the documents to include the dam removal and stay on schedule for the spring 2002 construction start.

*This Lawsuit*

In April 2010, plaintiffs filed a government claim for wrongful death and survivor damages for Goddard's drowning, in which they alleged the DFW and DWR, and/or another unnamed State agency, were responsible for the design, construction and maintenance of the dam.

In October 2010, plaintiffs filed their complaint for damages against the State and several other public entities, in which they alleged a single cause of action for government tort liability for alleged dangerous conditions of public property pursuant to sections 815.2, 815.4, 820, 830.8, 835 and 840.2. Specifically, they alleged that a breach in the dam, which had been present since the 1970's, caused a strong current over the dam remnant. They further alleged that Goddard, while lawfully in the Gateway Parcel

---

[4] The installation of the fish ladder was reported in an October 15, 1974 Modesto Bee article, which stated that a salmon ladder was installed that day after crane operators smashed a five-foot wide, four-foot deep trench in the submerged dam to prepare for the ladder, which was donated by the DFW. According to the article, the project was funded by donations by private citizens, the crane was donated by a local company, the operation was supervised by a building contractor who donated his time to the project, and fisheries biologists repaired the fish ladder and prepared it for installation.

of the TRRP at or near the dam, got swept up in the current, went over the breach, got caught under the rush of water, and drowned.

The plaintiffs alleged there were "dangerous conditions of public property owned, operated, possessed, used, constructed, built, controlled, repaired and maintained" by the State and the other public entity defendants, which (1) existed at the time of the accident, (2) were the legal causes of the alleged injuries and damages, and (3) created a substantial and reasonably foreseeable risk of the kind of injuries, harm and losses described in their complaint. The plaintiffs alleged that the dangerous conditions were created by the negligent or wrongful acts or omissions of an employee of the State, and the defendants had actual or constructive notice of the dangerous conditions in sufficient time before the accident to have taken measures to remedy, or protect against, them.

Because plaintiffs specifically alleged in their government claim that DWR and DFW had ownership or control of the dam, when the State filed its answer to the complaint in December 2010, it did so acting by and through DWR and DFW.

*The Summary Judgment Motion*

In October 2013, the DWR and DFW filed a joint motion for summary judgment. They pointed out that as separate and distinct departments, each was entitled to its own summary judgment. They argued summary judgment should be granted because: (1) DWR did not own or control the dam or its remnant; (2) DFW did not own the dam or its remnant, and did not have control over the remnant as it did not have the authority, and was not obligated, to remove the dam remnant or maintain the fish ladder in the breach; (3) both DWR and DFW are immune from liability for the dam's failure under Water Code section 6028; and (4) both DWR and DFW are immune under the natural conditions immunity of sections 831.2 and 831.21.

In their opposition, plaintiffs argued summary judgment should be denied because: (1) the State failed to carry its burden of showing it did not own the river and evidence the plaintiffs submitted shows the State owns the riverbed of all navigable rivers; (2) the

7.

natural condition immunity is inapplicable because the dam remnant is not a natural condition of public property; (3) the Water Code section 6028 immunity does not apply because plaintiffs do not contend the dangerous condition resulted from the dam's partial or total failure; (4) there is a triable issue of material fact regarding the DWR's ability to exercise control over the land where the dangerous condition is located, as the State did not submit any evidence that the DWR cannot exercise control over either the land or the dam; and (5) there is a triable issue of material fact regarding the DFW's ability to exercise control over the dam.

In addition to filing a document responding to the DWR's and DFW's separate statement of undisputed material facts, plaintiffs filed a separate document containing their "Separate Statement of Additional Undisputed Material Facts."  In their reply brief, the DWR and DFW urged the trial court to reject the plaintiffs' separate statement and exhibits because it was not an authorized pleading in opposition to a summary judgment motion under Code of Civil Procedure section 437c or the applicable rules of court.

At oral argument, the trial court stated that while it reviewed the plaintiffs' separate statement, it did not "pay any attention to it" as it did not think the statement was procedurally proper.  It did receive and consider, however, a declaration plaintiffs submitted from an expert, Edgar B. Washburn, who rendered an opinion concerning the ownership of the dam and opined that the State owns the bed of the Tuolumne River where the dam remnant is located.  The trial court asked plaintiffs' counsel what DFW had done other than in 1970 "they did some cleanup and then sometime that fish ladder went away."  Plaintiffs' counsel responded that the evidence showed (1) the DFW exercised the ability to control the dam when it breached it and installed the fish ladder in the 1970's, and (2) there was a meeting that coincided with the streambed alteration agreement in which the DFW took part.  The trial court rejected the natural conditions immunity because there was no evidence before it of the condition of the river before the dam was constructed.  After some argument concerning the applicability of the Water

8.

Code section 6028 immunity, the trial court stated it was going to deny the summary judgment motions.

The attorney for DWR and DFW asked for an articulation of the ruling under Code of Civil Procedure section 437c, subdivision (g).  The trial court responded that based on the facts, there were material issues of disputed fact as to what "Water Code section 6028 means about the ownership of the property" and whether the fact the State owns the navigable waterways and has the right to control them means the State would have some type of liability under a dangerous condition theory.  The State's attorney then asked about DFW's liability.  The trial court asked plaintiffs' counsel if he had an argument for DFW "other than something that happened in the 1970's?"  Plaintiffs' counsel responded that there was a material issue in dispute because DFW actually exercised control over the structure and there is nothing to show they could not exercise control again.  The trial court stated it had not heard anything other than what DFW did in 1970, it did not see any triable issue of fact as to what DFW did, and since it was a separate entity, it would grant DFW's summary judgment motion.  The trial court found the evidence presented showed there was no triable issue of fact that DFW had any responsibility or control, and "had nothing to do with it[,]" and the Fish and Game Code "immunity section" was sufficient to grant immunity.  Accordingly, the trial court granted the motion for DFW, but denied it for DWR.

### DISCUSSION

By their complaint, plaintiffs seek to impose liability under section 835, which states that a public entity may be liable for injury caused by "a dangerous condition of its property."  For purposes of this section, property of a public entity means real or personal property "owned or controlled by the public entity."  (§ 830, subd. (c).)  A public entity may not be held liable under section 835 for a dangerous condition of property that it does not own or control.  (*Aaitui v. Grande Properties* (1994) 29 Cal.App.4th 1369,

1373-1377 (*Aaitui*); *Chatman v. Alameda County Flood Control etc. Dist.* (1986) 183 Cal.App.3d 424, 430-431.)

To prevail on its summary judgment motion, DFW was required to establish without material factual dispute either that a necessary element of plaintiffs' case could not be proved or that DFW had a complete defense. (Code Civ. Proc., § 437c, subds. (a), (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) To negate an element of the plaintiffs' case, DFW asserted it did not own or control the dam or the dam remnant. Alternatively, to establish a complete defense, DFW argued it was entitled to immunity under Water Code section 6028 (which prohibits actions against the State for damages caused by the partial or total failure of any dam or reservoir) or Government Code section 831.2 (which provides immunity against claims for injuries caused by a natural condition of any unimproved public property).

The trial court granted summary judgment to DFW on the ground it did not own or control the river, dam or the dam remnant. On appeal, plaintiffs address each of the grounds DFW asserted below and contend summary judgment should have been denied because none of them was established. Contrary to plaintiffs' position, we conclude that DFW established without triable issue of material fact that it was entitled to natural-condition immunity under section 831.2. While section 831.2 provides a complete defense, we also conclude, in the alternative, that the DFW established without triable issue of material fact that did not own or control the river, dam or dam remnant.[5]

---

[5] Even though the trial court rejected the natural-condition immunity and granted summary judgment in DFW's favor on another ground, we may address the rejected issue since it is our role to review the validity of the ruling, not the reasons therefor, and we affirm the summary judgment if it is proper on any of the grounds raised below. (*United Air Lines, Inc. v. County of San Diego* (1997) 1 Cal.App.4th 418, 434 fn. 15.) We note that under Code of Civil Procedure section 437c, subdivision (m)(2), before we can affirm an order granting summary judgment on a ground the trial court did not rely on, we are required to afford the parties "an opportunity to present their views on the issue by submitting supplemental briefs." Supplemental briefing, however, was not required here because the parties have already been provided that opportunity, as plaintiffs directly

*Standard of Review*

On appeal from a summary judgment, our task is to independently determine whether an issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601.) "We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards." (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373.) We apply the same three-step analysis required of the trial court. First, we identify the issues framed by the operative complaint and answer since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503; *Chevron U.S.A., Inc. v. Superior Court* (1992) 4 Cal.App.4th 544, 548, disapproved on another point in *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1245.)

In so doing, we view the evidence in the light most favorable to the party opposing the motion; we liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts in favor of the opposing party. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

*The Natural Condition Immunity*

---

addressed the issue in their briefs, and DFW addressed it in its reply brief. Therefore, the purpose of section 437c, subdivision (m)(2) has been fully met. (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 471 fn. 39.)

Section 831.2 states:  "Neither a public entity nor a public employee is liable for an injury caused by a natural condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach."  (§ 831.2.) The immunity provided by section 831.2 is absolute and applies regardless of whether the public entity had knowledge of the dangerous condition or failed to give warning. (*Winterburn v. City of Pomona* (1986) 186 Cal.App.3d 878, 880-882; *Arroyo v. State of California* (1995) 34 Cal.App.4th 755, 763 (*Arroyo*).)  The legislative purpose in enacting section 831.2 was to ensure that public entities will not prohibit public access to recreational areas due to the burden and expense of defending against personal injury suits and of placing such land in a safe condition.  (*Arroyo*, *supra*, at p. 761.)

The statutory immunity is fully applicable to manmade lakes and reservoirs. (*Osgood v. County of Shasta* (1975) 50 Cal.App.3d 586, 587-588; *Eben v. State of California* (1982) 130 Cal.App.3d 416, 421-423 (*Eben*).)  Moreover, section 831.2 has been broadly construed to provide immunity even where a natural condition has been affected in some manner by human activity or nearby improvements.  (See, e.g., *Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 928-929 (*Knight*) ["a combination of human activities and natural forces . . . particularly where it produces, over a long period of time, a condition similar to those which occur in nature, has repeatedly been held to come within the immunity provided by section 831.2"], disapproved on another point by *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7; *Tessier v. City of Newport Beach* (1990) 219 Cal.App.3d 310, 314 (*Tessier*) ["It is now generally settled that human-altered conditions, especially those that have existed for some years, which merely duplicate models common to nature are still 'natural conditions' as a matter of law for purposes of Government Code section 831.2"]; *Morin v. County of Los Angeles* (1989) 215 Cal.App.3d 184, 188 (*Morin*) [same]; see also *Eben*, *supra*, 130 Cal.App.3d at pp. 422-425 [human regulation of artificial lake's water level]; *County of Sacramento v. Superior Court* (1979) 89 Cal.App.3d 215, 218 [water level and flow of river controlled

12.

by upstream dam]; *Fuller v. State of California* (1975) 51 Cal.App.3d 926, 936-939 [nearby improvements on beach caused sand buildup resulting in dangerously shallow water].)

The *Knight* case is instructive. There, a bodysurfer was gravely injured when wave action abruptly hurled him against a hard sand bottom in the ocean. (*Knight*, *supra*, 4 Cal.App.4th at p. 923.) The bodysurfer sued three public entities, including the City of Capitola, for a dangerous condition of public property under section 835, relying on the fact that one or more of the entities had rebuilt the beach 17 years before the accident by depositing a large quantity of imported sand at the beach site and constructing a large rock "groin" jetty that protruded into the ocean at right angles to the beach line, the purpose of which was to alter the wave action to establish an equilibrium between natural removal and replacement of the beach sand. No other work was done to the beach after 1970 and the beach essentially remained intact. (*Knight*, *supra*, 4 Cal.App.4th at pp. 924-925.)

The bodysurfer appealed from the trial court's grant of the city's summary judgment motion. (*Knight*, *supra*, 4 Cal.App.4th at p. 923.) The appellate court affirmed on the ground that that the city was entitled to natural-condition immunity under section 831.2. (*Knight*, *supra*, 4 Cal.App.4th at p. 926.) The court rejected the bodysurfer's arguments that there were triable issues of fact as to whether the public property was unimproved and whether the condition was natural. (*Id.* at p. 927.) The court explained that since the last clause of section 831.2 "provides public entities with immunity, without express reference to the improved or unimproved status of the property, for injuries caused by 'any natural condition of *any* lake, stream, bay, river or beach[,]'" the mere fact that the beach had been artificially rebuilt and sheltered by an artificially created rock groin was insufficient in and of itself to negate section 831.2 immunity. (*Knight*, *supra*, 4 Cal.App.4th at pp. 927-928.) Instead, the relevant inquiry was whether the bodysurfer's injuries were caused by a natural condition. (*Id.* at p. 927.)

13.

The court noted that while the question of whether the interaction between the beach and the waves was a "'natural condition'" in light of the beach's reconstruction and addition of the rock groin "might be more difficult in the abstract," "'[i]t is now generally settled that human-altered conditions, especially those that have existed for some years, which merely duplicate models common to nature are still "natural conditions" as a matter of law for the purposes of . . . section 831.2.'" (*Knight*, *supra*, 4 Cal.App.4th at p. 928.) The court concluded, based on the evidence before it, that it could be inferred that the condition of the beach, even if artificially created, occurred in nature. (*Id.* at pp. 928-929.)

In so holding, the court explained: "In sum it appears as a matter of law that at most a combination of human activities and natural forces created the condition which resulted in [the bodysurfer's] tragic injuries. Such a combination of forces, particularly where it produces, over a long period of time, a condition similar to those which occur in nature, has repeatedly been held to come within the immunity provided by section 831.2." (*Knight*, *supra*, 4 Cal.App.4th at p. 929.)

Applying these principles here, the issue is whether Goddard's drowning was caused by a natural condition of the Tuolumne River. Plaintiffs argue it was not because the "human-altered, artificial, abandoned and condemned Dam remnant cannot be considered a duplicate model common to the natural condition of the river or riverbed. The man-made, artificial structure is not part of a natural element like a beach or shoreline. The structure is unnatural and has created a 'drowning machine.'"[6]

_____

[6] In their opening brief, plaintiffs cite to an exhibit presented to the trial court in opposition to the summary judgment motion, which is a printout of a webpage from an on-line boater safety course about safe boat operation around dams, locks and bridges. The webpage warns boat operators that they need to be extra cautious around dams; states that a "low-head dam is the most dangerous type of dam and has been named the 'drowning machine'"; while low-head dams do not appear to be dangerous because of their small size and drop, "water going over a low-head dam creates a strong recirculating current or backroller (sometimes referred to as the 'boil') at the base of the dam" which

14.

Plaintiffs' focus on the dam remnant as the natural condition at issue is misplaced. Instead, the focus is on the condition it creates, namely the current created by the remnant, which plaintiffs contend caused Goddard's death, and whether a recirculating current duplicates a model common to nature. The water condition plaintiffs describe generally would be understood as a natural phenomenon that could be created not only by a man-made low-head dam or weir, but also by nature, such as a waterfall, rocks that run across a river or trees that are stuck in the river. The dam had been deteriorating essentially since its installation in 1933. By 1962, it had deteriorated to the point where it no longer fell within DWR's jurisdiction. From the time the mid-channel breach was created and the fish ladder installed in 1974 to Goddard's death in 2009, a nearly 35-year time span, the stretch of the Tuolumne River and breached remnants remained in place. This human-altered condition, which had existed for many years, merely duplicated a model common to nature and we consider it a natural condition as a matter of law.

As in *Knight*, it appears here that a combination of human activities and natural forces created the condition which resulted in Goddard's death. This combination of forces produced over a long period of time a condition similar to that which occurs in nature, and therefore it comes within the immunity provided by section 831.2. (*Knight*, *supra*, 4 Cal.App.4th at p. 929.)

*Ownership and Control*

As we have already stated, a public entity may not be held liable under section 835 for the dangerous condition of property that it does not own or control. (*Aaitui*, *supra*, 29 Cal.App.4th at pp. 1374-1377.) The trial court granted summary judgment to DFW after apparently finding it could not be liable because it did not own or control the dam remnant.

---

can trap a vessel against the face of the dam and pull a boater under the water, even while wearing a life jacket.

15.

Plaintiffs first argue that the trial court should have denied the motion because DFW failed to show it did not own the land on which the remnant is located and asserts "[t]he State of California owns the land where the dangerous condition is located." The argument fails because plaintiffs based their complaint on allegations of ownership and control of the dam and the dam remnant, not the land on which they are located. The property identified in the complaint is the dam, which plaintiffs allege was dangerous due to the breach that had been present in the dam since the 1970's that caused "a strong current over the center of the remnants of the dam." Plaintiffs do not allege that the property that is dangerous is the riverbed itself. The pleadings in a summary judgment motion delimit the scope of the issues and frame the issues; the burden of a defendant moving for summary judgment only requires negating the plaintiff's theories of liability as *alleged in the complaint*. (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.)

Even if they had alleged the riverbed was the property at issue, the fact that the State owns the riverbed does not mean that DFW is the proper defendant based on that ownership. As DFW points out, it submitted in its moving papers that it is a separate and distinct department that is authorized to exist and act under the Fish and Game Code. As a separate department, governed by its own statutory scheme and with its own powers, budgets, duties and organizational structure, it was entitled to a separate judgment. (*Greyhound Lines, Inc. v. Department of the California Highway Patrol* (2013) 213 Cal.App.4th 1129, 1134-1135.)

DFW is not the State agency that has jurisdiction over the riverbed. DFW, formerly named the Department of Fish and Game, is part of the State's Resources Agency; its director is appointed by the governor. (Fish & G. Code, §§ 700, 701.) DFW's duties include enforcing the Fish and Game Code through regulations it adopts. (Fish & G. Code, § 702.) DFW "manages wildlife, fish, and plant resources to protect their ecological, commercial, recreational and scientific value. Among its duties are

16.

issuing hunting and fishing licenses; reviewing environmental impact reports; enforcing hunting and fishing regulations; and developing waterway management plans." (9 Witkin, Cal. Proc. 5th (2008) § 185, p. 1301.) Plaintiffs do not point to any authority to show that DFW has any jurisdiction over the beds of navigable rivers.[7] Plaintiffs do not dispute that DFW did not own the dam or the dam remnant. Accordingly, the trial court properly found that liability could not be imposed on DFW due to ownership of the property.

This leaves the issue of control. "[C]ontrol exists if the public entity has the 'power to prevent, remedy or guard against the dangerous condition.'" (*Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 990.) The dangerous condition alleged in the complaint is the breach in the dam that caused a strong current to run over the center of the dam remnant. In moving for summary judgment, DFW asserted that it did not have control over the dangerous condition because, although the breach was created when the fish ladder was installed, the dangerous condition, i.e. the strong current running over the breach, was caused by the fish ladder washing away after its installation. DFW argued that after the fish ladder was installed, it did not have the power to prevent the dangerous condition from occurring, since under Fish and Game Code section 5935 the dam's owner, here the City, was obligated to maintain the fish ladder. It further argued that once the fish ladder washed away, it did not have the power to remedy the dangerous condition by removing the dam remnant.

On appeal, plaintiffs argue there is no evidence that the dangerous condition was created when the fish ladder washed away, and the mere fact DFW created the breach in 1974 shows it is able to exercise control over the dangerous condition. DFW responds that the undisputed evidence shows that it did not simply create the breach; it created the

---

[7] To the contrary, the DFW asserts that it is the California State Lands Commission (Commission) which has jurisdiction over the beds of navigable rivers, lakes and streams, which it holds for the benefit of all of the people of the State.

17.

breach and occupied it with a fish ladder, which later washed away. DFW asserts it is a matter of common sense that the dangerous condition was created when the fish ladder washed away, as that was when the breach was exposed. We agree that such an inference can be made from the evidence presented.

The issue then is whether DFW had control over the fish ladder once it was installed, such that it could have prevented the dangerous condition from forming. DFW asserts it did not, citing to Fish and Game Code section 5935, which provides: "The owner of any dam upon which a fishway has been provided shall keep the fishway in repair and open and free from obstructions to the passage of fish at all times." Under this section, it is the dam's owner, not DFW, who is responsible for repair and maintenance of the fish ladder. Thus, DFW did not have control after the fish ladder was installed.

Plaintiffs argue this section is inapplicable because a dam did not exist at the time of the accident, as DWR determined in 1962 that the dam remnant was no longer a dam. But, as DFW points out, the word "dam" in Fish and Game Code section 5935 is defined in Fish and Game Code section 5900, subdivision (a), as including "all artificial obstructions." Certainly the dam remnant qualifies as an artificial obstruction. The fact that DWR determined the dam no longer fell within its jurisdiction because it did not qualify as a dam as defined in Water Code section 6002[8] does not mean that it was not a dam for purposes of Fish and Game Code section 5935.

Finally, plaintiffs contend that because DFW exercised control over the dam remnant by breaching the dam in 1974 and did not present any evidence to show it could not presently continue to exercise control over the remnant, there is a triable issue of

---

[8] As pertinent here, Water Code section 6002 defines a "dam" as "any artificial barrier, together with appurtenant works, which does or may impound or divert water, and which either (a) is or will be 25 feet or more in height . . . or (b) has or will have an impounding capacity of 50 acre-feet or more." This definition governs the construction of Part 1, "Supervision of Dams and Reservoirs[,]" of Division 3, "Dams and Reservoirs[,]" of the Water Code. (Wat. Code, § 6000.)

material fact as to whether DFW currently has the ability to exercise control over the remnant.

As DFW points out, before governmental tort liability may be imposed for a dangerous condition, the public entity must either own or control the public property at issue at the time of the injury. (*Longfellow v. County of San Luis Obispo* (1983) 144 Cal.App.3d 379, 383.) Therefore, the mere fact that DFW took part in breaching the dam and installing the fish ladder in 1974 does not mean it had the power to remedy the dangerous condition, by either repairing the breach or removing the dam remnant, when Goddard drowned in 2009. To the contrary, DFW exists to enforce the Fish and Game Code (Fish and G. Code, § 702), not to exercise control over dams or their remnants. Instead, the evidence showed that the City, as the dam's owner, not the DFW, had the ability to remove the dam remnant. At best, DFW exercised a regulatory role with respect to the dam remnant. But, as DFW points out, that does not equate to control. (See *Public Utilities Com. v. Superior Court* (2010) 181 Cal.App.4th 364, 375-376 [Although Public Utilities Commission had authority to regulate railroad crossing and order others to correct dangerous condition, it lacked control over the crossing because it had no authority to correct the dangerous condition itself.].)

In sum, DFW did not have jurisdiction over the riverbed, and therefore did not "own" it for purposes of liability under section 835. It also did not control the dam remnant, as it did not have the power to repair the breach or remove the remnant. Accordingly, we affirm the grant of summary judgment in DFW's favor on the plaintiffs' claim for dangerous condition of public property.

19.

## **DISPOSITION**

The judgment in DFW's favor is affirmed.  Costs on appeal are awarded to DFW.

_____
GOMES, Acting P.J.

WE CONCUR:

_____
DETJEN, J.

_____
SMITH, J.