Filed 12/15/21  Watts v. City of L.A. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| ROBERT JEFFREY WATTS, | B296338 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC583821) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge. Affirmed in part and dismissed in part.

Abir Cohen Treyzon Salo, Boris Treyzon and Cynthia Goodman; Esner, Chang & Boyer, Holly N. Boyer, Shea S.

Murphy and Kevin K. Nguyen for Plaintiff and Appellant Robert Jeffrey Watts.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus, Blithe S. Bock and Jonathan H. Eisenman, Deputy City Attorneys for Defendant and Appellant City of Los Angeles.

_____

## INTRODUCTION

In 2014, appellant Robert Jeffrey Watts was cycling on the shoulder of Pacific Coast Highway (PCH), within the jurisdiction of respondent the City of Los Angeles (the City). When he reached a point at which the shoulder was blocked by landslide material, Watts entered the adjacent driving lane, was struck by a vehicle, and suffered severe injuries. Watts sued the State (which owned PCH and later settled with him) and the City, asserting dangerous condition of public property under Government Code sections 830 and 835.[1]  He did not sue the driver who struck him.

At trial, to establish the City's control of the road, as required under sections 830 and 835, Watts relied on a maintenance agreement between the City and the Department of Transportation (Caltrans), which required the City to sweep litter and debris off the relevant portion of

_____

[1]  Undesignated statutory references are to the Government Code.

2

the road.  The parties later submitted a written stipulation to the court that the shoulder of the road was covered by the "toe of the landslide" at the time of the incident.[2]  After some modifications, the stipulation was read to the jury:  the "ground immediately under the toe of the [landslide] was covered by the toe at the time of the incident."  Following trial, a jury found for Watts and determined that he suffered over $9 million in damages, assigning the City 60 percent of the fault, and none to the driver.

The City then moved in the alternative for (1) judgment notwithstanding the verdict (JNOV), arguing it had no control over the road as a matter of law, and (2) a new trial, arguing the evidence did not support the jury's failure to assign fault to the driver.  The trial court denied the City's motion for a new trial, but granted JNOV, finding that the City had no control over the road.  The court reasoned that (1) under the parties' stipulation, the toe of the landslide covered the shoulder, (2) the City was required only to sweep the road, and (3) sweeping could not have cleared the toe of the landslide.

Watts appealed the trial court's grant of JNOV.  On appeal, he argues, inter alia, that the court misconstrued the stipulation between the parties, that the evidence supports a finding that the shoulder was blocked by sweepable debris, and that even if the toe of the landslide blocked the shoulder,

---

[2]     As described below, the "toe of the landslide" was defined at trial as "where the landslide encounters the ground surface."

the City had control of the road.  The City filed a protective cross-appeal, challenging the trial court's denial of its alternative motion for a new trial.

We agree with the trial court's analysis and conclusion that the City did not control the road as a matter of law, and thus cannot be held liable for its dangerous condition. Accordingly, we affirm the trial court's judgment.  Given this disposition, we dismiss the City's protective cross-appeal as moot.

## BACKGROUND
### A. The Accident and Watts's Complaint

In July 2014, Watts was cycling on the northbound right shoulder of PCH in Los Angeles, between Sunset Boulevard and Porto Marina Way.  Just south of Porto Marina Way, the shoulder was blocked by a landslide from the adjacent hillside, known as the Tramonto Landslide.[3] Upon reaching the blocked area, Watts entered the adjacent driving lane, where he was immediately struck by a vehicle driven by Matt Dymond, causing him to fall and sustain significant injuries, including permanent brain damage.

Watts subsequently sued the State, which owned PCH, and the City, asserting a single cause of action for dangerous

---

[3]     According to testimony at trial, the Tramonto Landslide had been active since at least 1936.

4

condition of public property.[4]  He did not sue Dymond.
Before the case went to trial, Watts and the State settled.

### B. The Trial

#### 1. Watts's Theory of Liability

As explained below, a public entity can be liable only
for a dangerous condition of *its* property.  (§ 835.)  And
property of a public entity is property the entity owns or
controls.  (§ 830, subd. (c).)

At trial, Watts sought to establish that the City
controlled the relevant portion of PCH for purposes of his
claim, by presenting a maintenance agreement between the
City and Caltrans, effective in January 2005.  The
maintenance agreement delegated to the City the task of
sweeping "litter and debris" on that stretch of PCH.  Under
the agreement, the City was to sweep the road with a street
sweeper no less than once a month.[5]  Watts attempted to

---

[4]     Under section 835, a public entity may be liable for injuries
caused by a dangerous condition of its property if either (1) an
employee of the entity created the dangerous condition through a
negligent or wrongful act or omission, or (2) the entity had notice
of the dangerous condition with enough time before the injury to
have taken measures to protect against the dangerous condition.
(§ 835.)

[5]     Under the maintenance agreement, the City's sweeping
frequency would increase if pollution discharge standards
required it, but no evidence regarding those standards or
whether they required additional sweeping was presented at
trial.

show that despite having notice of the landslide and despite its duty and authority to sweep the roadway, the City failed to remedy the dangerous condition by properly sweeping the shoulder of PCH.[6]

### 2. *Trial Testimony*

Dymond, the driver whose vehicle struck Watts, described the accident at trial. He recalled telling police that the collision occurred "right where the shoulder is gone, right where the mountain meets the lane." Dymond returned to the site of the accident within days to take photos. The photos, which were entered into evidence, appeared to show the landslide covering the shoulder of PCH. We include one of these photos for reference:

---

[6] Watts also sought to show that the City failed to take various actions on the hillside above the highway to stop the movement of the landslide. However, the trial court ultimately precluded him from submitting this theory to the jury. Watts does not challenge this ruling. We thus detail only the evidence relevant to the issues on appeal.



Retired City engineering-geologist Robert Hancock testified that he evaluated the Tramonto Landslide as part of his job. Hancock stated that "during periods of heavy rainfall, the landslide started to move, and it moved down onto the shoulder of Pacific Coast Highway" and "Caltrans crews came through, picked up the debris, and moved it off as the debris came down onto the shoulder." During the trial, the parties and multiple witnesses frequently referred to the "toe of the landslide." In response to a question by the City's counsel, Hancock defined the "toe of the landslide" as "where the landslide encounters the ground surface." When

7

asked how a toe could be removed, he explained that clearing a toe would require "something on the order of like a front-end loader or a piece of machinery with a large bucket," which would then "load it into dump trucks." A sweeper could not perform the task.

Caltrans engineering-geologist Gustavo Ortega testified that "debris" or "material" from the landslide had encroached onto the roadway. He noted that in 2005, Caltrans maintenance crews had to "constantly" clean around the landslide because of the abundant rainfall that year. He stated that Caltrans crews "spend a lot of time shaving the toe of the slide."

Clarence Young and Langston Phillips, two of the City's sweeper operators, testified about their work and the sweepers' capabilities. Young confirmed that a sweeper can remove "small portions of rock and sand and debris," but testified it could not pick up anything larger than a baseball. During Phillips's testimony, Watts's counsel showed him the following photo of the Tramonto Landslide on the shoulder of PCH in 2010, four years before the accident:



Counsel then asked Phillips how far the sweeper's brushes would "go through" in the photo. Phillips replied that the brushes would go "[o]n the outskirts of the toe," which counsel then described as "this brown area." Phillips, however, said that whether the sweeper could actually clean that area "depends on what it is": "It's not going to just pick up just anything. . . . I wouldn't know unless I was there personally to know whether it was loose or permanent."

Edward Ruzak, Watts's traffic-engineering expert, opined that the blockage of the shoulder constituted a dangerous condition. He further opined that assuming there was "pretty much always" debris on the shoulder of the road, the City did not adequately sweep it. He testified that the City's maintenance "failed to clear the shoulder and keep it clear for the bicyclists. . . ." In response to questioning, Ruzak confirmed that "the encroachment on PCH is the toe of the Tramonto Slide" and that "the toe completely covers

9

the shoulder."[7]  He testified that a sweeper could not clean up the shoulder, and that "something like a bulldozer or a grader" would be necessary.

### 3. *The Parties' Stipulations*

The evidence at trial established that the City's responsibility to sweep the roadway extended to any paved portion.  During the trial, the parties submitted two written stipulations to the court:  (1) "the ground immediately under the toe of the Tramonto Landslide ('shoulder'), where the subject incident occurred[,] was at the time of the incident[] paved with asphalt . . . "; and (2) "said shoulder was covered by the toe at the time of the incident, where the subject incident occurred."  The parties later read out the first written stipulation to the jury, stating, "[T]he ground immediately under the toe of the Tramonto Landslide, the shoulder where the subject incident occurred, was at the time of the incident paved with asphalt . . . ."

Toward the end of trial, the court sought to ensure that the parties agreed on the written stipulations before delivering them to the jury, together with the jury instructions.  At that time, the City's counsel objected to the phrase "where the subject incident occurred," noting uncertainty as to the precise point of impact.  The court later

---

[7]     After the City cited this testimony in its brief, with an accurate citation to the record, Watts wrongly asserted in his reply brief that Ruzak never gave this testimony.

advised the jury of the following two stipulations: "[1.] [T]he ground immediately under the toe of the Tramonto Landslide was, at the time of the incident, paved with asphalt . . . . [¶] 2. Said ground immediately under the toe of the Tramonto Slide was covered by the toe at the time of the incident."

### C. The Jury Instructions and the Verdict

At the close of trial, the court instructed the jury on the elements of Watts's claim for a dangerous condition of public property.[8] Among other things, the jury was instructed under CACI No. 1100, that for Watts to prevail, it had to find that the City "owned or controlled the property" (though it was undisputed that the City did not own PCH). The jury was further instructed under CACI No. 1101, that in deciding whether the City controlled the property, it was to consider whether the City "had the power to prevent, fix or guard against the dangerous condition."

Following deliberations, the jury returned a verdict for Watts, including a special verdict finding that the City "own[ed] or control[led]" the property. The jury determined that Watts suffered over $9,000,000 in damages, assigning

---

[8] The jury was instructed only on Watts's theory that the City had sufficient notice of the dangerous condition before the injury. The jury was not asked to determine whether a City employee's negligent or wrongful conduct created the dangerous condition. Watts does not challenge the court's instructions on appeal.

11

the City 60 percent of the fault for his harm, with the remaining 40 percent assigned to the State (which had already settled with Watts), and none to Watts or Dymond.

### D. The City's Post-Judgment Motions

Following the verdict, the City filed alternative motions for JNOV and a new trial. The City's new trial motion challenged the jury's failure to apportion any fault to Dymond. The trial court denied this motion.

In its motion for JNOV, the City argued that it lacked control of PCH's shoulder as a matter of law. It contended that its contractual duty to sweep in the area was insufficient to support the jury's finding, given that it could not have swept away the toe of the landslide. Watts opposed the City's motion, arguing that it was sweepable "accumulated debris" that blocked the shoulder of PCH and constituted the dangerous condition, rather than the toe of the landslide. In its reply, the City argued that Watts's position contravened the parties' stipulation at trial that it was the toe of the landslide that covered the shoulder.

At a hearing on the City's motion, Watts's counsel asserted it was sweepable "trash debris" that caused Watts to enter the traffic lane. The court then asked counsel, "So what do you do with your stipulation that it was the toe of the slide?" Counsel replied that the jury had heard "no definition for the word 'toe,'" but the court disagreed. In response to questions by the court regarding the maintenance agreement, Watts's counsel conceded that it

12

required the City only to sweep the roadway, and that the City had no authority, for example, to "put up orange cones on PCH and block the area of the [landslide] in order to get a bulldozer in there to remove the debris."

After the hearing, the trial court issued an order granting the City's motion for JNOV, concluding that the City did not control the shoulder of PCH as a matter of law. It explained that the parties had stipulated that "the 'shoulder was covered by the toe'" of the landslide (quoting the parties' written stipulation), that the maintenance agreement required the city only to sweep litter and debris, and that sweeping could not have cleared the toe of the landslide.[9] Watts timely appealed from the court's judgment in favor of the City.[10]

---

[9] The court determined that the interpretation of the maintenance agreement was a judicial task, reasoning that neither party claimed its language was ambiguous or sought to introduce extrinsic evidence regarding its meaning. Consulting dictionary definitions of the word "debris," among other interpretive aids, the court concluded this term referred to "'something discarded such as rubbish . . . ,'" and could not have referred to the toe of the landslide.

[10] As noted, the City filed a protective cross-appeal, challenging the trial court's denial of its alternative motion for a new trial, but our affirmance of the judgment renders the City's cross-appeal moot.

## DISCUSSION

Watts challenges the trial court's grant of JNOV for the City, contending the court erred in holding that as a matter of law, the City did not control the shoulder of PCH for purposes of Watts's dangerous condition claim. Among other things, he claims that the court misconstrued the parties' stipulation to find that the toe of the landslide completely covered the shoulder. He further claims this finding did not preclude the verdict because the jury could have found that the City's failure to sweep properly in the years before the accident caused the toe to cover the shoulder.

As explained below, we agree with the trial court's analysis and conclusion that the City lacked control over the roadway as a matter of law. Because control was a necessary element of Watts's claim, the jury's verdict for him could not stand.

### A. Legal Principles

#### 1. JNOV

In reviewing a JNOV, we apply the same standard the trial court applied in ruling on the motion, "determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.) "Substantial evidence is evidence that is 'of ponderable legal significance', 'reasonable

14

in nature, credible, and of solid value' . . . ."
(*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.)
Speculation and conjecture do not constitute substantial
evidence.  (*Roddenberry v. Roddenberry* (1996) 44
Cal.App.4th 634, 651.)  We review the trial court's resolution
of legal questions de novo.  (*McCoy v. Pacific Maritime Assn.*
(2013) 216 Cal.App.4th 283, 302.)

### 2. *Stipulations and Contractual Interpretation*

As noted, the trial court's ruling relied on a stipulation
between the parties.  A stipulation to the existence of a fact
conclusively establishes that fact.  (See *Palmer v. City of
Long Beach* (1948) 33 Cal.2d 134, 141-142 (*Palmer*) [unless
trial court permits party to withdraw from stipulation, "it is
conclusive upon the parties, and the truth of the facts
contained therein cannot be contradicted"]; *Bigler-Engler v.
Breg, Inc.* (2017) 7 Cal.App.5th 276, 308 (*Bigler-Engler*) [jury
was not free to disregard parties' stipulation].)  Courts
interpret stipulations under the ordinary rules of contractual
interpretation.  (*Dowling v. Farmers Ins. Exchange* (2012)
208 Cal.App.4th 685, 694.)  "'The fundamental goal of
contractual interpretation is to give effect to the mutual
intention of the parties.'"  (*State of California v. Continental
Ins. Co.* (2012) 55 Cal.4th 186, 195 (*Continental*).)  "'If
contractual language is clear and explicit, it governs.'"
(*Ibid.*)  "The whole of a contract is to be taken together, so as
to give effect to every part, if reasonably practicable, each

15

clause helping to interpret the other." (Civ. Code, § 1641.) Generally, "contract interpretation is an issue of law, which we review de novo . . . ." (*DFS Group, L.P. v. County of San Mateo* (2019) 31 Cal.App.5th 1059, 1079.)

### 3. Dangerous Condition Liability

Section 835 sets out conditions under which a public entity will be liable for an injury caused by a dangerous condition of "its property."[11] (*Ibid.*) Under section 830, property of a public entity is property "owned or controlled by the public entity . . . ." (§ 830, subd. (c).) As relevant to Watts's theory at trial, "control exists if the public entity has the 'power to prevent, remedy or guard against the dangerous condition.'" (*Goddard v. Department of Fish & Wildlife* (2015) 243 Cal.App.4th 350, 364 (*Goddard*); accord, *Avey v. County of Santa Clara* (1968) 257 Cal.App.2d 708, 712 ["'a city cannot be liable for a dangerous or defective condition of a public street or highway unless it has

---

[11] The statutory conditions are: (1) "that the property was in a dangerous condition at the time of the injury," (2) "that the injury was proximately caused by the dangerous condition," (3) "that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred," and (4) either (a) that "[a] negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition," or (b) that "[t]he public entity had actual or constructive notice of the dangerous condition" with "sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (§ 835.)

authority to remedy the condition'"], quoting *Gillespie v. City of Los Angeles* (1950) 36 Cal.2d 553, 556.)

### *B. Analysis*

Like the trial court, we conclude the City did not control the shoulder of PCH for purposes of Watts's claim: (1) the parties stipulated at trial that the toe of the landslide covered the shoulder, and it was this blockage of the shoulder, according to Watts, that constituted a dangerous condition; and (2) the City could not have remedied this dangerous condition because sweeping -- the only task the maintenance agreement authorized the City to perform on the roadway -- could not have cleared or diminished the toe. Watts's alternative theory on appeal -- that the City's failure to sweep properly in the years before the accident caused the toe to cover the shoulder -- is unsupported.

### *1. The Parties Stipulated That the Toe of the Landslide Covered the Shoulder, and the City Could Not Have Cleared the Toe Through Sweeping*

As noted, the jury heard two relevant stipulations by the parties. First, the parties stipulated that "the ground immediately under the toe of the Tramonto Landslide, the shoulder where the subject incident occurred, was at the time of the incident paved with asphalt . . . ." This stipulation therefore equated "the ground immediately under the toe" of the landslide to the relevant portion of the

shoulder of PCH. The subsequent iteration of this stipulation omitted the clause, "the shoulder where the subject incident occurred," but the jury was not instructed to disregard the earlier iteration.[12]

Second, and more important, the parties stipulated, "Said ground immediately under the toe of the Tramonto Slide was covered by the toe at the time of the incident." Read in the context of the first stipulation, this second stipulation established that "the shoulder" of the roadway "was covered by the toe at the time of the incident." The language of the stipulation was thus clear and express, and it conclusively established that the toe of the landslide covered the shoulder of the road. (See *Palmer*, *supra,* 33 Cal.2d at 141-142; *Bigler-Engler*, *supra,* 7 Cal.App.5th at 308; *Continental*, *supra,* 55 Cal.4th at 195.)

The circumstances surrounding the parties' stipulation support this straightforward interpretation. The parties' written stipulations, submitted to the trial court, stated simply that the "shoulder was covered by the toe at the time of the incident . . . ." This stipulation was also entirely consistent with the undisputed evidence presented to the jury. The photos Dymond took after the accident appeared to show the shoulder of PCH covered by the landslide itself, rather than by small and detached debris. Dymond testified

---

[12]     As noted, the City's counsel objected to this clause because of uncertainty regarding the point of impact. Nothing suggests counsel objected to equating the "ground immediately under the toe" with the shoulder.

18

he told police that the collision occurred "where the shoulder is gone, right where the mountain meets the lane," indicating that the mass of the landslide reached all the way to the driving lane. Watts's own expert, Ruzak, confirmed in response to questioning that "the toe completely cover[ed] the shoulder."

In discussing the stipulation at the hearing on the City's motion for JNOV, Watts's counsel never disagreed with the trial court's reading of the stipulation as establishing that the toe covered the shoulder; rather, counsel asserted that no testimony defined the term "toe." (See *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393 [party's conduct following execution of contract may reveal parties' understanding and intent].) In fact, the City elicited uncontradicted testimony by Hancock, a former engineering-geologist with the City, defining the "toe of the landslide" as "where the landslide encounters the ground surface," and explaining that clearing a toe would require a front-end loader or other heavy machinery, rather than a sweeper. Ruzak, too, stated that a sweeper could not clean up the toe, and that something like a bulldozer or grader would be required for the task.

In his opening brief, Watts fails to address this second stipulation, notwithstanding that the trial court expressly relied on it in granting JNOV for the City. Indeed, he fails to mention it. Instead, he points to the first stipulation, concerning the paving of the shoulder with asphalt, as if that were the stipulation on which the trial court relied. Not

19

until his reply brief does Watts acknowledge the second stipulation and belatedly attempt to argue that it did not establish that the toe of the landslide covered the shoulder. By failing to note and discuss the second stipulation in his opening brief, Watts has forfeited his contentions regarding its meaning. (Cf. *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 183 [opening brief's "disregard for the facts as found by the trial court . . . results in a forfeiture of arguments on appeal"].)

Moreover, forfeiture aside, Watts's contentions are unpersuasive. First, Watts contends the language of the stipulation -- that the "ground immediately under the toe of the Tramonto Slide was covered by the toe" -- is "inscrutable," and he suggests we disregard it: "Given the vast amounts of statements that are made by the parties and the court during a trial, and specifically a relatively long and complex trial such as this one, sometimes things that are said on the record are redundant, mistranscribed, or simply make no sense." According to Watts, to the extent the second stipulation had any purpose, it was to reinforce that the shoulder of PCH was paved with asphalt and thus within the scope of the City's responsibility to sweep under the maintenance agreement.

But as discussed, the second stipulation had a clear meaning, supported by both the parties' written submission to the trial court and the evidence at trial. It was neither mistranscribed nor senseless. Watts's proposed reading of the second stipulation -- that it established only that the

20

shoulder was paved with asphalt -- would indeed render it redundant in light of the first stipulation, which stated just that. Yet interpreting this language as redundant would be contrary to governing principles of contractual interpretation. (See Civ. Code, § 1641.) Watts offers no textual basis for his proposed interpretation, and we find none.

Second, Watts notes that the City did not rely on the second stipulation to argue that it lacked control over the road until its reply brief in moving for JNOV. However, regardless of the City's conduct after the parties' stipulation, the language of the stipulation is unambiguous and therefore controls. (See *Continental, supra,* 55 Cal.4th at 195.) And as explained, Watts's own trial counsel did not challenge the trial court's reading of the stipulation below.

Third, Watts asserts that an attorney may not impair the client's substantial rights through a stipulation without the client's specific authorization, and he contends that the trial court's reading of the second stipulation essentially resolved the core factual issue in the case, amounting to an "impermissible agreement to dismiss [his] claim." However, Watts did not argue below -- nor does he expressly contend in his reply brief on appeal -- that his counsel acted without authorization in entering the stipulation. His apparent claim of counsel's lack of authority to enter the stipulation is therefore subject to a second layer of forfeiture. (See *Dumas v. Los Angeles County Bd. of Supervisors* (2020) 45 Cal.App.5th 348, 357 [argument not raised below is

21

forfeited].) That Watts and his counsel may not have appreciated the significance of the stipulation does not mean it was made without authorization.

Fourth, Watts claims that even if read to establish that the toe of the landslide covered the shoulder, the stipulation is irrelevant, because it did not establish "the precise meaning of the term 'Toe' . . . , where it ended[,] and where sweepable debris began." While acknowledging Hancock's definition of the "toe," Watts asserts this testimony "did not define where on the roadway the toe ended." But whatever gap remained in the evidence as to the full extent of the toe, the stipulation, as well as the other evidence recounted above, established that it at least covered the shoulder.

It is undisputed that the maintenance agreement obligated and empowered the City only to sweep the roadway; the City was neither required nor authorized to use heavy machinery, or even, as Watts's counsel conceded, to "put up orange cones on PCH and block the area of the [landslide]," in order to remove or reduce the size of the toe. It is likewise undisputed that the City could not have swept away the toe of the landslide, as both Hancock and Ruzak testified at trial that more than sweeping would have been required. Indeed, according to Caltrans engineering-geologist Ortega, it was Caltrans who, over the years, worked to suppress the toe's expansion by "shaving" it, indicating it was Caltrans's responsibility to confine the toe, rather than the City's. Given the parties' stipulation that the toe covered the shoulder, given that this covering of the

22

shoulder is what constituted the dangerous condition according to Watts, and given that the City was powerless to prevent or remedy this condition at the time of the injury, the trial court correctly concluded that the City did not control the shoulder as a matter of law.[13]  (See *Goddard, supra,* 243 Cal.App.4th at 364.)  Absent the City's ownership or control of the road, the road was not the City's property under sections 830 and 835, and the City thus could not be held liable for its dangerous condition.  (See §§ 830, 835.)

## 2. *Watts's Alternative Theory That the City Could Have Contained the Landslide in the Years Before the Accident Is Unsupported*

Pointing to the 2010 photo of PCH, which showed the toe of the landslide only partially covering the shoulder, Watts argues the jury could have concluded that the City's "repeated failures to sweep the debris in years prior" was what caused the toe to overtake the shoulder by the time of his accident, in 2014.  He claims the jury could have found that the City previously had the power to prevent or guard against the dangerous condition.  We disagree, as there was no evidence at trial that timely removal of any sweepable

---

[13]     In light of our conclusions, we need not address Watts's additional contentions regarding the meaning of the term "debris" in the maintenance agreement and whether the interpretation of the agreement was a task for the court or the jury.

debris would have prevented the toe from overtaking the shoulder.[14]

Watts offered no evidence that the landslide advanced onto the roadway through the gradual accumulation of sweepable debris, rather than through the movement of soil and large debris that could not have been swept away. No expert, nor even a lay witness, supported a link between the City's alleged failure to properly sweep removable debris from the shoulder and the toe's growth. Speculation and conjecture that better sweeping would have prevented the toe from covering the shoulder are insufficient. (See *Roddenberry v. Roddenberry*, *supra,* 44 Cal.App.4th at 651.)

_____

[14] We also question whether Watts's theory is legally sound. (See *Tolan v. State of California ex rel. Dept. of Transportation* (1979) 100 Cal.App.3d 980, 983 [to be liable, "the public entity must be . . . in control of the property *at the time of the injury*" (italics added)]; *id.* at 982-984 [State was not liable for injury on street over which it relinquished ownership and control three years before injury, even though dangerous condition existed at that time]; *Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 924-925, 932-933, disapproved on another ground by *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 [claim against county had no basis in law, where plaintiff suffered injuries at beach the county did not control at that time, notwithstanding plaintiff's theory that county had *created* dangerous condition by participating in beach's reconstruction years earlier]; *Goddard, supra,* 243 Cal.App.4th at 366 [agency's actions on dam remnant in 1974, which arguably led to creation of dangerous condition, did not support agency's control of the property at time of decedent's drowning in 2009].) We need not decide this issue, however, given our conclusion that this theory is factually unsupported.

Watts points to testimony that the landslide would periodically deposit debris onto the shoulder of PCH. But none of this testimony established this was the kind of debris the City could have swept up. For instance, Hancock stated that "during periods of heavy rainfall, the landslide started to move, and it moved down onto the shoulder of Pacific Coast Highway" and "Caltrans crews came through, picked up the debris, and moved it off as the debris came down onto the shoulder." At no point did Hancock describe the size or makeup of the debris, and his description of Caltrans's clearing of the debris suggested it was not done through sweeping. Similarly, Ortega, a Caltrans engineering-geologist, acknowledged that "debris" or "material" from the landslide had encroached onto the roadway. But he, too, did not describe the size or makeup of the debris. Ortega also noted that in 2005, when Caltrans's maintenance agreement with the City was already in effect, Caltrans maintenance crews had to clean "constantly" around the landslide because of the abundance of rain that year. He further stated that Caltrans crews "spend a lot of time shaving the toe of the slide." Ortega's testimony that Caltrans, rather than the City, was laboring to contain the landslide suggested that it could not be done through sweeping, which would have been the City's responsibility under the maintenance agreement.

Watts also misconstrues the testimony of Phillips, one of the City's sweeper operators, claiming that when shown the 2010 photo, Phillips testified that the sweeper would be

25

able to "sweep to the 'outskirts of the toe' and pointed to the 'brown area' in the picture." In fact, Phillips testified that the sweeper's brushes could reach the outskirts of the toe, but explained that he could not say whether the "brown area" counsel referred to was something the sweeper could sweep up, without seeing it in person and determining whether it was loose material. Finally, Watts points to Ruzak's opinion testimony that the City "failed to clear the shoulder and keep it clear for the bicyclists." Yet this conclusory testimony by Ruzak, a traffic engineer, neither explained the progression of the landslide nor linked it to any action or omission by the City. In short, Watts offered no evidence that better sweeping by the City would have prevented the toe of the landslide from blocking the shoulder of PCH. Accordingly, Watts's alternative theory fails to support the City's control of the shoulder at the time of the accident.

## DISPOSITION

The judgment is affirmed.  The City's cross-appeal is dismissed as moot.  The City is entitled to its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

COLLINS, J.

CURREY, J.