Filed 8/30/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| CITY OF CHICO, | C092293 |
| Petitioner, | (Super. Ct. No. 18CV00707 ) |
| v. | |
| THE SUPERIOR COURT OF BUTTE COUNTY, | |
| Respondent; | |
| WENDY MCKENZIE et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Tamara L. Mosbarger, Judge.  Stay issued.  Petition granted with directions.

Alvarez-Glasman & Colvin, Sharon Medellin for Petitioner.

No appearance for Respondent.

Dreyer, Babich, Buccola, Wood, Campora, Roger A. Dreyer and C. Athena Roussos for Real Parties in Interest.

Plaintiff Wendy McKenzie was injured by a falling tree branch while jogging in Lower Bidwell Park, a municipal park owned by the City. She and her husband, Leslie McKenzie, real parties in interest, sued the City of Chico for personal injuries. The City seeks a preemptory writ of mandate directing the trial court to vacate its denial of its motion for summary judgment and to grant the motion. The City argues the trial court, in denying the motion, failed to recognize the City is immune from liability for injuries caused by a natural condition of unimproved public property, under Government Code section 831.2.[1]

We conclude immunity under section 831.2 applies as a matter of law and issue the requested writ.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### The City's Summary Judgment Motion

On June 2, 2017, plaintiff sustained severe injuries from a falling tree branch while jogging along South Park Drive in Lower Bidwell Park and sued the City. The City moved for summary judgment on multiple grounds, including that it was immune from liability under section 831.2 for injuries caused by a natural condition of unimproved public property.

---

[1] Undesignated statutory references are to the Government Code.

[2] The City makes several other contentions and an alternative request for relief. It argues it is immune for injuries caused by a condition of a path to recreational activities, under section 831.4 (trail immunity). It also argues the trial court erred in failing to identify a disputed material fact or evidence offered in support of or opposition to the motion. Finally, it argues the court erred in failing to rule on the City's evidentiary objections. As to the latter two arguments, it alternatively asks for a writ vacating the trial court's order and directing it to reconsider the motion in light of the evidentiary objections, and to enter a new order complying with Code of Civil Procedure section 437c, subdivision (g). Because we conclude that natural condition immunity under section 831.2 applies as a matter of law, we do not reach these additional contentions.

Bidwell Park is municipal park established in 1905 and is comprised of 3,670 acres. It is a "naturally occurring riparian woodland," located within the Sacramento River Basin. South Park Drive is designated a Class I bike path by the City, and provides pedestrian access through the park.[3] It is closed to public vehicle traffic.[4]

The subject tree is a 130-year-old Valley Oak tree and predates the establishment of the area as a municipal park. Valley Oaks are endemic to California and indigenous to the Sacramento River Basin.

The City argued the area of Valley Oak trees where the branch fell, as well as the subject tree itself, qualified as unimproved public property — and the presence of South Park Drive does not alter that. It asserted: "the falling of the subject branch was, in and of itself, an unpredictable, natural condition of the tree. Trees are living organisms and naturally lose branches or even fall." Further, it argued this case "is precisely the type of situation contemplated by the Legislature when it enacted [s]ection 831.2, namely, encouraging public access to recreational areas without imposing liability on public entities when injuries are caused by natural conditions."

In support of its summary judgment motion, the City provided the declaration of an arborist, who opined: "The subject tree is a [V]alley [O]ak (Quercus lobata), a tree species that is susceptible to the phenomenon of unexpected branch failure that is generally described as Sudden Branch Drop." "Sudden Branch Drop . . . is a 'sudden unanticipated failure of a tree branch with little or no discernible defect; often associated with long, horizontal branches and warm temperatures.' "

_____

[3] Class I bikeways are "bike paths or shared use paths. . . which provide a completely separated right-of-way designated for the exclusive use of bicycles and pedestrians with crossflows by motorists minimized." (Sts. & Hy. Code, § 890.4, subd. (a).)

[4] City maintenance and emergency vehicles have access on South Park Drive.

The City also cited deposition testimony that "unexpected breakage of a tree limb usually is a result of high temperatures, often associated with dehydration of the tissues, et cetera. And it's an unpredictable event."

**Plaintiffs' Opposition**

Plaintiffs' argued the branch failed due to years of neglect resulting in "a heavy, overloaded, and horizontally growing branch that overwhelmed the point of attachment between the branch and the trunk." They asserted: "This excessive weight combined with the horizontal growth characteristic created a dangerous condition of public property that should and would have been obvious to any properly trained arborist conducting a basic ground-level assessment. The City's failure to engage in any standard maintenance and risk mitigation allowed this dangerous condition to exist." (Capitalization omitted.)

As to section 831.2, plaintiffs argued the City failed to meet its initial burden of establishing immunity, in that the City's separate statement included no factual basis showing the property is natural and unimproved. Plaintiffs maintained there was "ample evidence that the subject tree constitutes unnatural, improved property." They argued it is located in "the middle of a highly developed municipal park, not far from Highway 99." It is "straddled by" the paved South Park Drive and a "smaller paved bicycle path." It is 20 feet from South Park Drive and "much closer to the smaller . . . bicycle path."[5] Plaintiffs noted the tree's roots are "almost certainly growing underneath" these improvements. They also asserted that a "nearby picnic site" constitutes "additional improvements."

Plaintiffs also argued the park — in the middle of Chico and with two million annual visitors — is not the type of public land contemplated for natural condition

---

[5] The surface of the smaller bike path is decomposed granite. As a shorthand, we will refer South Park Drive and the smaller bike path collectively as the human-made pathways.

immunity. They suggested natural condition immunity applies only to "primitive regions of the state," and not to "an urban park in an urban setting, with the subject tree constituting part of the C[ity's] urban forest."

Regarding the subject tree, plaintiffs noted calluses evinced pruning both on the fallen branch and other parts of the tree. They asserted: "such pruning *could* push growth to the remaining branches. Such pruning, by altering the size and structure of the tree and branch, effectively eliminates the tree's natural and unimproved character." (Italics added.) Plaintiffs further argued, "the C[ity] previously pruned the subject tree, but failed to properly manage the tree in any form for at least 18 years prior to the incident, as it had not even inspected the tree since 1999 to ensure that its prior pruning did not exacerbate the tree's dangerousness." (Capitalization omitted.) Plaintiffs alleged no facts supporting a finding that the previous pruning actually caused the branch to break.

Instead, plaintiffs cited deposition testimony of Richie Bamlet, the City's Urban Forest Manager, stating: "There did seem to be some callousing that suggests old pruning had grown over" — though Bamlet could not determine when the tree had been pruned.[6] Bamlet also testified that, "if you remove one branch, the tree's typical response is to push growth into the remaining branches" and trimming limbs off a larger branch will increase the diameter of the branch itself. When asked again, about the effect of pruning the branch that broke, he testified the "remaining branches *may* become larger than they otherwise would have been." (Italics added.) Bamlet testified growth from pruning would be to the diameter of the branch, but "if the tree is old and slow growing, the diameter increase will be very small." Bamlet did not testify that pruning would increase the length of the branch or that the prior pruning caused the branch to fail.

---

[6] A different deponent testified that he had inspected the tree in 1999 and concluded "it was fine," and there was no need to prune it.

Plaintiffs argued that "such pruning, by altering the size and structure of the tree and branch, effectively eliminates the tree's natural and unimproved character."

Plaintiffs also attached a declaration from an arborist, disagreeing that the cause of the branch failure was sudden branch drop. He opined: "the subject large branch failed . . . as a result of excessive end weight and loading. This excessive weight created significant leverage at the point of attachment between the branch and the main trunk. This branch grew in a more horizontal characteristic and at an increasing length, which in turn continued to overload the point of attachment. This combination of excessive weight and leverage put incredible stress on the attachment with the main trunk, resulting in a failure with violent tearing of the branch from the main trunk that left an approximately 20-foot vertical tear in the main trunk." He continued: "The length and weight of the subject branch would have showed clear and obvious conditions that indicated the branch was heavy and leveraged with end weight." Plaintiffs' arborist was critical of the City's expert arborist because the City's arborist did not mention "end weight, leveraging or loading." Plaintiffs' arborist stated that the quality of the attachment point was not the problem; rather "it is the extended overweight leverage of the branch that overloaded an otherwise normal attachment point." (Italics added.) "Excessive end weight loading and leverage is a common cause of branch failure" and the "end-weighted and leveraged conditions . . . provide a simple and proper explanation for the cause of the failure." He added: "The excessive end weight on the subject large branch would have been visible and apparent to any individual conducting a ground level risk assessment with a basic level of knowledge of trees and arboriculture" and, "[e]nd weight reduction via pruning is the proper risk mitigation strategy for heavy, overleveraged branches, such as the branch that failed in the subject incident."

While plaintiffs' arborist opined that regular pruning to reduce "excessive end weight loading" is a typical mitigation practice, he did not opine that increases to the diameter of the branch resulting from prior pruning had anything to do with the branch

6

failure. Nor did he offer any opinion that previous pruning caused or contributed to the branch to break. And while he acknowledged the existence of the two human-made pathways and a "picnic area," he did not state those things played any role in the branch breaking.

The central theory of plaintiffs' opposition to the summary judgment motion was the City's alleged failure to engage in "[r]outine maintenance and formative pruning . . . to mitigate the risks presented by heavy, overgrown trees." In summarizing their opposition, plaintiffs argued that: "Instead of maintaining its crown jewel and protecting its citizens from the obvious risk of harm, the City has simply neglected its duties and allowed its urban forest to spin out of control. This resulted in the subject branch becoming overgrown, overweight, overloaded, and overleveraged, so much so that the tree's otherwise sturdy wood could no longer support the branch. This failure was entirely predictable and far from 'sudden,' as it was the result of years of neglect and abdication of the City's basic responsibilities when it comes to trees." (Capitalization omitted.)

As for section 831.2 natural condition immunity, plaintiffs' assertions focused on the claim that the City failed to establish the natural and unimproved character of the tree and its surroundings. They did not argue that the prior pruning, the human-made pathways or "nearby picnic area" *caused* the branch to break.

### The Trial Court's Ruling

The trial court denied the City's motion for summary judgment, explaining in a written ruling: "there are triable issues of material fact as to whether the subject tree created a substantial risk of injury, whether the alleged dangerous condition was created by a negligent or wrongful act or omission of Defendant, and whether Defendant had either actual or constructive notice of the condition." As for section 831.2 natural condition immunity, without elaboration, the court found it "inapplicable as [the City] has

7

failed to satisfy its burden to show the alleged injuries were caused by a natural condition of unimproved public property."[7]

## DISCUSSION

### I. The Parties' Contentions

The City contends it is immune from liability, under section 831.2, as the injury was caused by "a natural condition of unimproved public property." It argues the area of Valley Oak trees near the incident, including the subject tree, is unimproved City property. It points out that the subject tree is undisputedly a 130-year-old, naturally occurring Valley Oak, endemic to California and the area, and served by a natural water source. No causal nexus exists between the dangerous condition and any improvements near the tree. And there is no evidence that pruning caused the branch to break.

We issued an order to show cause as to why relief should not be granted. Real party in interest plaintiffs answered, arguing that immunity does not apply because the area where the tree is located is "neither natural nor unimproved." To that, Plaintiffs assert the City's separate statement did not assert the property was unimproved — instead the City admits the park is an established municipal park, within the City. Plaintiffs argue the injury occurred on improved property, given the tree is located in a highly developed municipal park, in an urban setting, nearby Highway 99. The tree is also straddled by South Park drive and a bike path, and there is a picnic site "nearby." And the fallen branch itself had extended over South Park Drive, and the tree's roots grew under it.

Plaintiffs also argue the evidence shows the tree itself was neither natural nor unimproved property because of the prior pruning, which they assert were human-made alterations to the tree that contributed to the dangerous condition. They cite Bamlet's

---

[7] The court also found trail immunity under section 831.4 inapplicable, reasoning that "the alleged dangerous condition is unrelated to the trail itself."

deposition testimony that the tree had been pruned, which typically contributes to the heaviness of tree limbs. They also cite evidence that the tree had not been pruned for at least 18 years, and that the limb failed due to its excessive weight. They conclude that "[c]ombined with the failure to prune the tree for many years thereafter, [the earlier pruning] further added to the weight of the branch and created a hazardous risk of failure."

We agree with the City that, as a matter of law, section 831.2 provides absolute governmental immunity here.

## II. Summary Judgment

" 'A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citations.] '[G]enerally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.' [Citation.] If a defendant shows that one or more elements of a cause of action cannot be established *or that there is a complete defense to that cause of action*, the burden shifts to the plaintiff to show that a triable issue exists as to one or more material facts. [Citations.] If the trial court finds that no triable issue of fact exists, it then has the duty to determine the issue of law." (*Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 553; see Code Civ. Proc., § 437c.)

## III. Section 831.2 Immunity

Section 831.2 was enacted to ensure that public entities will not prohibit public access to recreational areas because of the burden and expense of defending against personal injury suits and of placing such land in a safe condition. (*Alana M. v. State of California* (2016) 245 Cal.App.4th 1482, 1487 (*Alana M.*); *Goddard v. Department of Fish & Wildlife* (2015) 243 Cal.App.4th 350, 360 (*Goddard*); *Arroyo v. State of*

9

*California* (1995) 34 Cal.App.4th 755, 761.)[8]  "By requiring that those using unimproved public property assume the risk of injury caused by natural conditions there, the Legislature assured that such areas remain open to the public."  (*Bartlett v State of California* (1988) 199 Cal.App.3d 392, 398.)

To that end, section 831.2 provides:  "Neither a public entity nor a public employee is liable for an *injury caused by a natural condition of any unimproved public property*, including but not limited to any natural condition of any lake, stream, bay, river or beach."  (Italics added.)  Section 831.2 immunity "is absolute and applies regardless of whether the public entity had knowledge of the dangerous condition or failed to give warning."  (*Goddard, supra,* 243 Cal.App.4th at p. 360.)  Section 831.2 is given "broad application" and should not be "construed narrowly."  (*Alana M., supra,* 245 Cal.App.4th at p. 1487; *Fuller v. State of California* (1975) 51 Cal.App.3d 926, 937 (*Fuller*), discussing *Rendak v. State of California* (1971) 18 Cal.App.3d 286 (*Rendak*).)

Critically, for a plaintiff "to avoid the natural condition immunity, there must be a 'causal nexus between the dangerous condition and either human conduct or an artificial improvement.'  [Citation.]  The immunity applies unless an improvement or human conduct created, contributed to, or exacerbated the degree of, the danger associated with a

---

[8]  This legislative purpose was spelled out in a Senate Legislative Committee Comment to section 831.2, which provides in pertinent part: "It is desirable to permit the members of the public to use public property in its natural condition and to provide trails for hikers and riders and roads for campers into the primitive regions of the State.  But the burden and expense of putting such property in a safe condition and the expense of defending claims for injuries would probably cause many public entities to close such areas to public use.  In view of the limited funds available for the acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property in its natural condition to assume the risk of injuries arising therefrom as a part of the price to be paid for benefits received."  (1964 Ann. Rep. (Dec. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 232, italics added; see Sen. Com. on Judiciary, Rep. on Senate Bill No. 42 (1963 Reg. Sess.) 2 Sen. J. (1963 Reg. Sess.) p. 1891.)

natural condition.' " (*Alana M., supra*, 245 Cal.App.4th at p. 1489.) See also *Keyes v. Santa Clara Valley Water District* (1982) 128 Cal.App.3d 882, 888 [In sustaining a demurrer grounded on section 831.2 immunity, court rejected plaintiff's contention he had pleaded facts sufficient to show his cause of action lies outside the breadth of section 831.2; "[n]either [plaintiff's] complaint nor his proposed amended pleading alleges th[e] *necessary element of causal nexus* between the dangerous condition and either human conduct or an artificial improvement" (italics added)]. Also critical to our analysis is the rule that " 'improvement of a portion of a park area does not remove the immunity from the unimproved areas.' " (*Alana M.* at p. 1488; *Meddock v. Yolo County* (2013) 220 Cal.App.4th 170, 178-179 (*Meddock*); *Rendak, supra,* 18 Cal.App.3d 286, 288.)

## IV. Analysis

### A. Natural Condition

Plaintiffs contend that given the evidence of pruning, the City has not carried its burden to show the tree was a natural condition. They point out that "[a] natural condition of land has been described as " 'land [that] has not been changed by any act of a human being," ' " citing the concurring opinion in *Milligan v. City of Laguna Beach* (1983) 34 Cal.3d 829, 836, fn. 1 (*Milligan*), conc. opn. of J. Kaus. In the cited footnote, the *Milligan* concurring opinion noted that a comment to a section in the Restatement Second of Torts explained that the term, " 'Natural condition of the land' is used to indicate that the condition of land has not been changed by any act of a human being . . . It is also used to include *the natural growth of trees*, weeds, and other vegetation upon land not artificially made receptive to them." (*Ibid.*, italics added.)

Here, the tree was naturally occurring and far older than the park. It was not planted by the City. (Cf. *Toeppe v. City of San Diego* (2017) 13 Cal.App.5th 921, 929 (*Toeppe*) [subject tree was planted when the human-made park was created].) Nor was it supplied with artificial irrigation. Located in the Sacramento River Basin, which

11

provides a natural water source, the tree has grown in this native area on its own for 130 years.

We agree with the *Milligan* concurrence insofar as it suggests the natural growth of indigenous trees in natural habitats is a natural condition. We do not agree with the premise suggested by plaintiffs that a natural condition always loses its character as such for purposes of section 831.2 immunity if changed by any act of a human being. Indeed, for years now, California courts have held that natural condition immunity can apply even where a public entity has made changes to natural conditions. For example, in *Knight v City of Capitola* (1992) 4 Cal.App.4th 918, 928-929 (*Knight*) (disapproved on other grounds *in Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7), public entities rebuilt a beach by importing sand and constructing a large rock jetty, 17 years before plaintiff's bodysurfing accident where a wave propelled him against the sand bottom. (*Knight,* at pp. 924-925.) After the beach had been rebuilt, the sand had moved under pressure from natural wave and current action. (*Ibid.*) The court stated: "In sum[,] it appears as a matter of law that at most a combination of human activities and natural forces created the condition that resulted in [plaintiff's injuries]. Such *a combination of forces, particularly where it produces, over a long period of time, a condition similar to those which occur in nature*, has repeatedly been held to come within the immunity provided by section 831.2." (*Id*. at p. 929, italics added.) Other cases involving human-made changes to beach areas – such as harbor dredging, construction of jetties, importing and depositing of new sand, gravel and rock resulting in changes to the landscape of beaches, creation of sandbars and shallowing the depth of water – arrive at the same conclusion. (See *Tessier v. City of Newport Beach* (1990) 219 Cal.App.3d 310, 314 ["It is now generally settled that human-altered conditions, especially those that have existed for some years, which merely duplicate models common to nature are still 'natural conditions' as a matter of law for the purposes of Government Code section 831.2"]; *Morin v. County of Los Angeles* (1989) 215 Cal.App.3d 184, 188 ["Immunity under

12

section 831.2 exists even where the public entity's nearby improvements together with natural forces add to the buildup of sand on a public beach"]; *Fuller*, *supra*, 51 Cal.App.3d at p. 938 [noting the combined acts of humans and nature up and down the California coast have caused substantial changes in the coastline's conditions; court concluded the Legislature could not have intended a narrow construction of "natural condition" to exclude such areas from immunity because of such changes and rejected the contention that section 831.2 immunity extends only to land that has not been "affected in any way by human activity"].)

We think the same applies to the natural condition here. The tree grew on its own accord in the many years after it was last pruned just as it had in the hundred plus years of its life before it was pruned. And even if growth of some unspecified amount to some unspecified parts of the tree was influenced by the pruning, the continued growth of the tree, like the ebb and flow of the ocean, was a natural occurrence. Similar to the beach cases, at best, what we have here is combination of a human activity and natural forces which, over time produced "a condition similar to those which occur in nature." (*Knight*, *supra*, 4 Cal.App.4th at p. 929.) Accordingly, the City carried its burden of establishing that the tree was a natural condition for purposes of section 831.2.[9]

## B. Of Unimproved Public Property

Plaintiffs also argue that the City failed to carry its burden of proving the natural condition was of unimproved public property, in that the City failed to establish that "the tree is on unimproved property and was otherwise unaltered." Plaintiffs focus on the fact

---

[9] We note that under plaintiffs' theory, if a city worker sees a dangerous branch and decides to prune it, natural condition immunity is forever lost because the tree could no longer be considered a natural condition. On the other hand, under plaintiffs' theory, if the city worker ignored the dangerous branch and did not cut it off, the city would enjoy natural condition immunity going forward. We consider plaintiffs' theory to be untenable.

13

that the tree trunk grew in an area between improvements (the two human-made pathways) and that plaintiff was struck by the fallen branch while on one of those pathways. We again disagree.

"[B]ecause the phrase 'of any unimproved public property' in section 831.2 modifies the 'natural condition' that caused the injury, the relevant issue for determining whether the immunity applies is the character (improved or unimproved) of the property at the location of the natural condition, not at the location of the injury. When the location of the injury is *different* from the location of the natural condition, the character of the location of the injury is not relevant." (*Alana M., supra*, 245 Cal.App.4th at p. 1489.) Thus, where the factual issue relates to falling tree branches, we look to where the tree trunk was growing to determine whether that area is improved or unimproved, not the area where the branch fell. (*Meddock, supra,* 220 Cal.App.4th at p. 173.)

*Meddock* is illustrative. There, the plaintiff was injured by a falling branch while he was in a paved parking lot of a county owned boat ramp, adjacent to an unimproved area by the river. (*Meddock*, *supra*, 220 Cal.App.4th at p. 174.) The subject tree was growing in the adjacent unimproved river area. (*Ibid*.) The plaintiff alleged that many of the nearby trees leaned away from the river, toward and over the parking lot, and some were diseased or infested with mistletoe, which created a dangerous condition. (*Ibid*.) And the subject tree was visibly dead. (*Ibid*.) The plaintiff alleged the county had failed to properly maintain the trees and warn of the danger. (*Ibid*.) We affirmed a grant of summary judgment to the county, explaining that because the injuries were caused by decaying native trees growing on unimproved property, the county was immune under section 831.2, even though the plaintiff was injured on improved property by an overhanging branch falling. (*Id*. at pp. 173, 177, 183.) We also noted that while immunity does not turn on the location of the injury, proximity to improvements nevertheless may inform causation, although it is not a substitute for it. (*Id*. at p. 178.)

14

Here too, the area where the tree is growing, as depicted in the photographs accompanying the summary judgment motion and opposition, is clearly undeveloped. It consists of the tall grass, shrubs and trees one would expect to see in a forest. And there was no evidence presented of any alteration in the natural condition of this area.

The fact that this undeveloped area where the subject tree was growing lies between two human-made pathways does not mean the tree was growing in an improved area, for purposes of section 831.2.[10] As we have noted, "improvement of a portion of a park area does not remove the immunity from the unimproved areas." (*Alana M., supra,* 245 Cal.App.4th at p. 1488; *Meddock, supra*, 220 Cal.App.4th at pp. 178-179; *Rendak, supra,* 18 Cal.App.3d at p. 288.) " 'The reasonableness of this rule is apparent. Otherwise, the immunity as to an entire park area improved in any way would be demolished. [Citation.] This would, in turn, seriously thwart accessibility and enjoyment of public lands by discouraging the construction of such improvements' " as the human-made pathways here. (*Alana M*., at pp. 1488-1489.)

Plaintiffs, nevertheless, attempt to distinguish *Meddock* because the parking lot in that case was the only evidence of nearby improvements, and the plaintiff did not argue the tree had been poorly pruned causing an unnatural danger or exacerbating a natural one. Plaintiffs insist that they, by contrast, have presented an argument of "poor pruning."[11] In support of their argument, plaintiffs rely heavily on *County of San Mateo*

---

[10] As noted, plaintiffs assert there is a picnic area "nearby," but it is not depicted in any of the photographs, and plaintiffs provided no facts indicating distance or where this purported picnic area is relative to the tree, or even what the picnic area consists of.

[11] Plaintiffs argue that the *Meddock* court recognized that "poor pruning" of trees could " 'cause a nonnatural danger, or exacerbate a natural danger' " such that immunity would not apply. Not so. First, *Meddock* was about decaying trees, and the reference to "poor pruning" related to the failure to prune decaying trees. (See *Meddock, supra*, 220 Cal.App.4th at p. 174 ["Meddock did not argue that the County *poorly pruned the trees, rather than letting them decay*, so as to cause a nonnatural danger, or exacerbate a natural

15

*v. Superior Court* (2017) 13 Cal.App.5th 724 (*San Mateo)*, which they claim is "highly analogous." It is not.

In *San Mateo*, a diseased tree fell on a tent in a campground, severely injuring the plaintiff. The tree was 20 feet from a paved road and surrounded by five campsites. (*San Mateo*, *supra*, 13 Cal.App.5th at p. 727.) After the county's motion for summary judgment was denied, the county petitioned for a writ of mandate to overturn the ruling. (*Id*. at p. 726.) Denying the petition, the appellate court in *San Mateo* cited evidence the tree trunk was actually growing within the campsite's boundary which raised a triable issue of whether the place the tree was growing was improved or unimproved. (*Id*. at pp. 734, 738.) It also cited evidence that the tree's root system was growing underneath the campsite and adjacent campsites, and that the weakening of the roots contributed to the tree's failure. (*Id.* at pp. 734-735) Expert testimony established that the construction of the campsite parking lot and other construction activities changed the soil and root environment, impairing the level of nutrients in the soil and causing the tree's roots to become " 'oxygen-starved' " and die. (*Id*. at p. 735.) Additionally, there was evidence that the removal of other trees in the area caused the subject tree to grow asymmetrically, making it susceptible to torsional loads from high winds. (*Ibid*.) The court concluded, "there are triable issues of fact as to whether the tree was growing in the same general location as the accident site or, even if it was not, was itself growing in an improved area by virtue of the artificial physical changes in its immediate vicinity." (*Ibid*.) It added, "a trier of fact could conclude that man-made physical changes in the vicinity of the

_____

danger" (second italics added)].) That is not what plaintiffs alleged happened here. Second, "[a]n appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' " (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.) In *Meddock*, we noted only that the plaintiff had not argued that "poor pruning" caused an unnatural danger and went on to explain the theory was therefore abandoned on appeal. (*Meddock, supra,* 220 Cal.App.4th at p. 175, fn. 2.) We did not express an opinion as to the validity of such a theory.

accident site contributed to the tree's dangerousness and thus were causally linked to its falling." "In short, in this case there is evidence that artificial improvements or human conduct 'weakened the tree and made it more likely to fail.'" (*Id*. at p. 740.)

Plaintiffs argue that akin to *San Mateo*, the tree, here, sits in a highly developed municipal park, straddled by the two human-made pathways. The tree's branches also extended over the bike path where the injury occurred.

But as we explained in *Meddock*, while proximity may inform causation, it is not a substitute for it. And unlike the failed tree in *San Mateo,* here, there is no evidence that the construction or existence of human-made improvements near the tree or located over the tree's root system caused the branch to fail.

In this regard, this case is more like *Alana M.*, *supra,* 245 Cal.App.4th 1482, where the plaintiff was injured when a tree fell on her tent while camping in a state park. (*Id*. at p. 1484.) After the trial court granted the state summary judgment, plaintiff appealed arguing a triable issue of fact existed as to whether the tree was on unimproved public property. (*Id*. at pp. 1484-1485.) The state had built roads, parking lots, campsites, hiking trails, restrooms, a visitor center, and various other buildings throughout the park. (*Ibid*.) And the indigenous tree that fell was located 60 feet from plaintiff's campsite and 24 feet from another campsite. (*Ibid*.) The tree itself had identifiable defects, including rot. (*Id*. at pp. 1485-1486.) The plaintiff alleged the state failed to properly maintain the campsite " 'and its environs.' " (*Ibid*.) Noting that improvement of a portion of a park does not remove immunity from unimproved areas, the *Alana M*. court affirmed the grant of summary judgment. (*Id*. at pp. 1488-1493.) It reasoned that no evidence suggested improvements or human conduct contributed to the danger. (*Id*. at p. 1491.) "There [was] no evidence, for example, that leveling the area of the campsites weakened the tree and made it more likely to fall." (*Ibid*.) Thus, the evidence established the tree "was a 'natural condition *of any unimproved public property*' under section 831.2 as a matter of law, and the natural condition immunity

17

applies." (*Ibid*.)  The court added "[t]he fact the tree fell on an improved campsite does not take this case outside the ambit of the natural condition immunity."  (*Ibid*.)

The only real difference between the instant case and *Alana M*. appears to be that the *Alana M*. court noted there was "no evidence of any artificial physical change in the condition of the tree."  (*Alana M., supra*, 245 Cal.App. 4th at p. 1491.)  Here, plaintiffs assert prior pruning represented a physical change that made the tree improved property.

Bamlet's deposition testimony established the tree appeared to have been pruned in the past, and pruning can "push growth" into the branch that was pruned and to other branches.  But absent is evidence connecting past pruning to the present incident.  There was evidence that a horizontally positioned tree limb is more susceptible to summer breaking than one at a 45-degree angle.  There was also the declaration of plaintiffs' expert stating that "the . . . branch failed . . . as a result of excessive *end weight* and loading" that "put incredible stress on the attachment with the main trunk . . . ."  (Italics added.)  But while Bamlet's testimony provided evidence that pruning *could* push growth to other branches of the tree and *may* make the remaining branches larger than they would have been, there was no evidence growth actually was pushed to the branch that broke, as opposed to other branches.  Nor was there evidence as to how much pruning was done to the branch or how much of the branch's growth was due to pruning as opposed to natural growth.  And while Bamlet said pruning could result in growth of the *diameter* of the branch (and the growth would be "very small" in an older slow growing tree), the plaintiffs' expert arborist opined the branch broke because of the *length of the branch* and excessive *end weight loading and leveraging*.  No one opined the prior pruning resulted in growth to the length of the branch or the end weight loading and

18

leveraging.[12]  And critically, no one opined that the prior pruning caused the subsequent break, not even plaintiffs' own expert arborist.

_____

[12] At oral argument, there seemed to be some confusion as to Bamlet's testimony on this point.  He did not testify that pruning could increase the length of the branch.  Rather, he testified that pruning could increase the diameter of the branch.  His testimony on this point is as follows:

"Q:  All right.· And when you prune a tree, does it affect the growth of the branch?

"A:  Yes.

"Q:  How so?

"A:  Well, if you remove one branch, the tree's typical response is to push growth into the remaining branches.

"Q:  Okay.  *And will that increase the size of a branch –*

"A:  *Yes.*

"Q:  *if you trim off limbs off of a larger branch?*

"A:  *Yes.*

"Q:  *And by " 'growth,' " we mean just in –*

"A:  *Diameter, yes.*

"Q:  *diameter of the branch itself.*

"A:  *Depends upon the vigor of the tree.  So if the tree is old and slow growing, the diameter increase will be very small.*  [¶] . . . [¶]

"Q:  Could you tell from looking at the branch whether it had been pruned in its lifetime?

"A:  There did seem to be some callousing that suggests old pruning had grown over.

"Q:  So a callous would be a spot where a branch was cut --

"A:  Yes.

"Q:  and then it calloused over.

As such, one can only speculate that the pruning — which preceded the incident by at least 18 years — might have played some role in the branch falling. This is insufficient to defeat a summary judgment motion. As courts have noted: " 'An issue of fact . . . is not created by "speculation, conjecture, imagination or guess work" . . . nor by "*mere possibilities*" ' " (*Usher v. White* (2021) 64 Cal.App.5th 883, 901 , quoting *Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197, italics added; see also Code Civ. Proc., § 437c, subd. (p)(2) ["plaintiff . . . shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto"]; *Hayman v. Block* (1986) 176 Cal.App.3d 629, 643 ["while the court in determining a motion for summary judgment does not 'try' the case, the court is bound to consider the competency of the evidence presented"].) Plaintiffs have therefore failed to show a triable issue of material fact as to "a 'causal nexus between the dangerous condition and either human conduct or an artificial improvement.' " (*Alana M., supra,* 245 Cal.App.4th at p. 1489.)

---

"A: Yes.

"Q: And when you do that, that's going to affect the growth, the size of the branch itself. True?

"A: It's going to reduce the size, yes.

"Q: Reduce the size of the branch *or is it going to push growth such as the branch is going to get a larger diameter*?

"A: *Remaining branches may become larger than they otherwise would have been* –

"Q: Okay.

"A: *if it hadn't have been pruned.*" (Italics added.)

## C. The Nature of the Park

Plaintiffs also argue this city park, used by over two million people annually, is not the sort of area where natural condition immunity is intended to apply and thus applying immunity would not further the expressed purpose of the statute. They note that our high court refused to apply section 831.2 natural condition immunity when its application would not further the expressed legislative purpose of the statute. (*Milligan, supra,* 34 Cal.3d at p. 832.)[13] Plaintiffs also argue the area where the branch broke cannot be described as " 'the primitive regions of the state.' "

To be sure, the Senate Legislative Committee Comment to section 831.2 referenced "primitive regions of the state," stating: "It is desirable to permit the members of the public to use public property in its natural condition *and* to provide trails for hikers and riders and roads for campers into the primitive regions of the State." (Italics added.) (See fn. 8, *ante*.) The conjunction "and," however, is important because it signals a list of two desirable outcomes: to permit the public to use public property in its natural condition (e.g. beaches) *and* to provide trails and roads into primitive regions of the state. We, therefore, do not read the comment as indicating intent to limit immunity to "primitive regions." And even if it could be so read, section 831.2's plain language is not limited to "primitive regions," however that term might be defined.

---

[13] In *Milligan*, several eucalyptus trees growing on the city's unimproved property fell causing damage to plaintiffs' residence which was on adjacent property. (*Milligan, supra*, 34 Cal.3d at p. 831.) Our high court held section 831.2 immunity inapplicable. (*Ibid*.) It stated: "we apply the natural condition immunity in accordance with the expressed purpose and refuse to apply it when application would not further the expressed purpose." (*Id*. at p. 832.) It then reasoned that because the legislative purpose of section 831.2 is to encourage public entities to open public land for public use, and that policy is not applicable to injuries occurring to nonusers on adjacent private land, immunity should not apply. (*Id*. at p. 833.)

Further, Bidwell Park was a naturally occurring riparian woodland in the Sacramento River Basin before an urban area began to grow around it and it was dedicated as a park. It remains a riparian woodland. That an urban area grew around it does not remove it from the ambit of section 831.2.

Plaintiffs also point to statements of Professor Van Alstyne, the lead drafter of the Government Claims Act, who wrote: "In short, *areas* which are 'developed' by cutting of roads and sidewalks, construction of buildings, vehicle parking areas, camping sites with stoves, running water, sanitary facilities, garbage service and organized recreational activities, or which consist of playgrounds, golf courses, picnic tables and other typical recreational facilities characteristic of municipal parks, would be excluded from the scope of this suggested immunity . . . . The distinction between the 'developed' and the 'undeveloped' sectors of a park might well be difficult to identify in terms of boundary lines on a map, and might have to be treated as a question of fact . . . ." (A Study Relating to Sovereign Immunity (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963) p. 496.) (Italics added.)

Van Alstyne's observation relates to developed "areas" where certain human-made changes have been made. We do not disagree that the things he listed can render the land upon which they are situated improved — but that does not render an entire park "improved" for purposes of section 831.2. Again, " 'improvement of a portion of a park area does not remove the immunity from the unimproved areas.' " (*Alana M., supra*, 245 Cal.App.4th at p. 1488; *Meddock, supra,* 220 Cal.App.4th at pp. 178-179; *Rendak, supra,* 18 Cal.App.3d 286, 288.)

Moreover, this court considered the above Van Alstyne excerpt in *Meddock*. We explained it did not raise any ambiguity as to section 831.2. (*Meddock, supra*, 220 Cal.App.4th at p. 179.) Section 831.2 unambiguously immunizes a city from liability "for an injury *caused by* a natural condition of *any* unimproved public property . . . ." (Italics added.) Accordingly, natural condition immunity extends to "any" unimproved

public property, and surrounding improvements are immaterial absent a causal nexus between those improvements and the dangerous condition of the public property.

Moreover, in *Meddock* we found the Senate commentary concerning section 831.2 compelling. As is pertinent here, it reads: " 'This section provides an absolute immunity from liability for injuries resulting from a natural condition of any unimproved public property. Thus, for example, under this section . . . the State has an absolute immunity from liability for injuries resulting from natural conditions of a state park area *where the only improvements are recreational access roads* (as defined in Section 831.4)[14] *and hiking, riding, fishing and hunting trails*." (*Meddock*, *supra*, 220 Cal.App.4th at p. 179, quoting 1964 Ann. Rep. (Dec. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 232, italics added; see Sen. Com. on Judiciary, Rep. on Senate Bill No. 42 (1963 Reg. Sess.) 2 Sen. J. (1963 Reg. Sess.) p. 1891.) That is exactly what we have here — recreational access roads/hiking and riding trails. The policy underlying section 831.2 clearly applies here.

### D. Conclusion

Because there is no evidence of a causal nexus between the prior pruning or any other improvement and the falling branch, the City is entitled to immunity under section 831.2, as a matter of law. We will therefore issue the requested writ.

### DISPOSITION

Let a peremptory writ of mandate issue directing the respondent Butte County Superior Court to vacate the order of June 25, 2020, in the superior court case number 18CV00707, entitled *Wendy McKenzie and Leslie McKenzie v. City of Chico,* denying the motion for summary judgment, and enter a new order granting the motion for summary

---

[14] Section 831.4 addresses trail immunity. It lists, among other things, trails which provide access to "hiking, riding" and "scenic areas." (§ 831.4, subd. (a)/(b).) The trail can be paved or unpaved. (*Toeppe*, *supra*, 13 Cal.App.5th at p. 926.)

judgment.  The stay order issued by this court on July 20, 2021, is vacated upon finality of this opinion.  The City shall recover its costs in this proceeding.  (Cal. Rules of Court, rule 8.493.)

 

                                                               /s/
                                                           MURRAY, J.

We concur:

/s/
RAYE, P. J.

/s/
HOCH, J.

24